UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINDE INC., Plaintiff, -against- RUSCHEMALLIANCE, LLC ET AL., Defendants. | 24-cv-5497 (ALC) **OPINION & ORDER** |

**ANDREW L. CARTER, JR., United States District Judge:**

Linde Inc. ("Plaintiff") brings this action against RusChemAlliance, LLC ("RCA"), Gazprom PJSC, Gazprom Export LLC, and Gazprom Helium Services, LLC (collectively "Defendants") for the seizure of property valued at approximately $5 million USD, seeking redress for the financial and operational harm suffered as a result of the seizure. Plaintiff asserts subject matter jurisdiction under 28 U.S.C. 1330 (a), which reads "The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." Defendant RCA moves to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction, claiming that it is not a foreign state, as defined under the FSIA. In the alternative, RCA argues that if it is a foreign state, it is immune from suit because the exceptions to immunity under the FSIA do not apply. ECF No. 28.

Because the Court finds that Plaintiff fails to adequately allege that RCA is a foreign state, Defendant's motion is **GRANTED.**

## BACKGROUND

### I. Factual Background

Linde Inc. is a US-based industrial gas company that produces, sells, and distributes atmospheric, process and specialty gases, including helium. ECF No. 1 ("Compl.") at ¶5. Linde Inc. sources the gases it distributes in a variety of ways, including purchasing the gases from third parties. *Id.* In December of 2017, Linde Gas North America LLC ("Linde North America") and Gazprom Export entered into a Helium Sales and Purchase Contract ("Helium Contract") whereby Gazprom Export would sell and Linde North America would purchase contractually predetermined amounts of helium that would be produced at a newly developed helium facility ("Gazprom Plant") in the Eastern region of Russia. *Id.* at ¶6. The Gazprom Plant is believed to be developed and operated by Gazprom Helium ("Operator"). *Id.* at ¶7. In January 2021, Linde North America assigned the Helium Contract to Linde Inc. *Id.* at ¶6.

Pursuant to the Helium Contract, Plaintiff was responsible for shipping its empty ISO helium containers, needed to transport the purchased helium, to the commercial port in Vladivostok, Russia. *Id.* at ¶8. From there, Gazprom Export, or the Operator, would take possession of the helium containers, and was responsible for: (i) inspecting, conditioning, and transporting Plaintiff's empty helium containers over 900 miles to the Gazprom Plant, (ii) filling the helium containers with liquified helium; and (iii) transporting the filled helium containers back to the Vladivostok Port for pickup by Plaintiffs. *Id.*

In early 2021, Gazprom Export notified Plaintiff that it anticipated starting production at the Gazprom Plant in the summer or fall of that year and would be able to deliver the contractually agreed upon helium to them. *Id.* at ¶9. Based on this representation, Gazprom Export's updates on anticipated helium availability, and requests for Plaintiffs to make helium containers available to

accept the promised helium, Plaintiffs began delivering its empty containers to Russia through the Vladivostok Port in the fall and winter of 2021. *Id.* Gazprom Export did not get the Gazprom Plant up as soon as, or to the degree it had promised, and ultimately never came close to supplying the contractually designated helium. *Id.* at ¶10.

When it became clear to Plaintiffs that Gazprom Export could not supply the contractually mandated helium, and that its helium containers were sitting empty in Russia, they made requests for the containers to be returned to the Vladivostok Port so that Plaintiffs could retrieve and utilize the containers elsewhere. *Id.* at ¶11. Gazprom Export did not comply, providing years of justifications and excuses as to why it could not deliver the helium containers to Linde Inc. *Id.* In July 2023, Gazprom Export admitted that "management" had not approved the release of the helium containers. In May 2023, Linde Inc. notified Gazprom Export that it was terminating the Helium Contract based on Gazprom's failure to meet minimum helium production requirements. *Id.* at ¶12. Despite the termination of the Helium Contract and Linde Inc.'s repeated requests for the return of the containers, Gazprom Export has failed to comply. *Id.* Upon information and belief, to date at least 10 of Linde Inc.'s Helium Containers remain in Russia. *Id.*

It is Plaintiff's belief that the helium containers are being held hostage by Gazprom Export due to an unrelated construction contract dispute between RCA and other Linde affiliates. *Id.* at ¶13. Non-parties Linde GmbH and Renaissance Heavy Industries LLC ("Renaissance") entered into two Engineering, Procurement, and Construction contracts (the "LNG Contract" and the "GPP Contract," collectively, the "Construction Contracts") with defendant RCA. Pursuant to the Construction Contracts, Linde GmbH and Renaissance were engaged to develop and construct a liquefied natural gas plant and a gas processing plant in Ust-Luga, Russia, located over 5,000 miles away from the Gazprom Plant. *Id.* at ¶14. Linde plc provided parent company guarantees, securing

certain payment obligations for each of the Construction Contracts. *Id.* at ¶15. Linde GmbH received advance payments totaling approximately €1.4 billion and secured by bank guarantees from a consortium of international banks. *Id.* at ¶16.

In February and April 2022, following Russia's invasion of Ukraine, the EU expanded then existing sanctions against Russia which, inter alia, targeted Russia's natural gas and impeded Linde GmbH's ability to fulfill its contractual obligations under the Construction Contracts. *Id.* at ¶18. In or around May 2022, Linde GmbH (and Renaissance) suspended performance of their obligations related to the natural gas plants affected by the sanctions. *Id.* RCA challenged the suspension of work and alleged a material breach of the Construction Contracts. *Id.* at ¶19. RCA purported to terminate the Construction Contracts on the grounds of the alleged material breaches, and demanded repayment of the advance, along with compensation for purported damages. *Id.* Linde GmbH (and Renaissance) disputed the validity of RCA's purported terminations and refused to make the demanded payments. *Id.* RCA then issued demands on Linde plc, but they refused to make payment as well. *Id.* at ¶20.

RCA terminated the Construction Contract in June 2023 and demanded the return of the advances. *Id.* at ¶21. However, the EU sanctions continued to suspend the contractual obligations of Linde GmbH, including the obligation to return the advance. *Id.* at ¶21. Despite the arbitration mechanism provided in the Construction Contracts, RCA initiated legal proceedings in Russia against Linde GmbH and Linde plc in the Court of St. Petersburg (the "Russian Court"), seeking damages for alleged breach of contract and repayment of the advance. *Id.* at ¶22. RCA also sought a freezing order over all of "Linde's" assets in Russia, both directly and indirectly owned by Linde GmbH and Linde plc, in an effort to ensure RCA's ability to collect on any future judgment in

connection with the contracts. *Id.* RCA subsequently commenced proceedings in the Russian Court, making essentially identical claims for repayment of the advance and damages. *Id.*

RCA was able to obtain an *ex parte* order freezing, and subsequently seizing, Linde GmbH and Linde plc's assets in Russia. *Id.* at ¶23. In furtherance of its Russian action involving the Construction Contracts, RCA obtained a separate seizure order in November 2023 in respect of assets owned by Linde Inc., an independent U.S.-based affiliate that is not party to the Construction Contracts. *Id.* at ¶24. As a result of the order, Linde Inc.'s helium containers were seized. *Id.* Plaintiffs believe RCA was working in connection with Gazprom Helium and Gazprom Export, and at the direction of Gazprom PJSC (and ultimately the Russian government), to seize Linde Inc.'s assets. *Id.* at ¶25.

## II. Procedural History

On July 19, 2024, Plaintiff filed their complaint against RusChemAlliance, LLC, Gazprom PJSC, Gazprom Export LLC, and Gazprom Helium Services, LLC. ECF No. 1. Plaintiffs failed to serve the Complaint, and an order filed on December 16, 2024, directed Plaintiffs to serve Defendants by December 23, 2024. ECF No. 6. On December 23, 2024 Plaintiff requested a pre-motion conference in relation to its anticipated motion to effectuate alternative service under the FSIA. ECF No. 7. On December 27, 2024, the Court granted Plaintiff leave to file the motion. ECF No. 9. On February 28, 2025, the Court granted Plaintiff's motion for leave to effectuate alternative means of services on Defendants under the FSIA. ECF No. 11.

On October 6, 2025, Defendant RCA filed this motion to dismiss for lack of jurisdiction. ECF No. 28. RCA subsequently filed declarations and a memorandum of law in support of the motion to dismiss. ECF Nos. 29-33. In response, Plaintiffs filed a memorandum of law in opposition to the motion to dismiss, followed by two declarations in support. ECF Nos. 38-40.

Defendant then filed four more declarations. ECF Nos. 41-44. Defendants also filed their reply to Plaintiffs memorandum on December 22, 2025. ECF No. 45. Defendants Gazprom PJSC, Gazprom Export LLC, and Gazprom Helium Services, LLC have not yet appeared in the action.

## STANDARD OF REVIEW

### I. Motions to Dismiss Under Federal Rules of Civil Procedure 12(b)(1)

In reviewing a motion to dismiss under Rule 12(b)(1), a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation and internal quotation marks omitted). "[B]ut jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* Rather, "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). Courts "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [the Court] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).

### II. Motions to Dismiss Under Federal Rules of Civil Procedure 12(b)(2)

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff must meet the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994)). At the motion to dismiss stage, the court must construe the pleadings and any supporting materials in the light most favorable to the plaintiff, resolving any doubts in favor of jurisdiction. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013). The court does not, however, draw "argumentative

inferences" in plaintiff's favor, nor does it accept as true a legal conclusion couched as a factual allegation. *See Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) (citing *Norton v. Larney*, 266 U.S. 511, 45 S. Ct. 145, 69 L. Ed. 413 (1925)). "Because a motion to dismiss for lack of personal jurisdiction is inherently a matter requiring the resolution of factual issues outside of the pleadings, all pertinent documentation submitted by the parties may be considered in deciding the motion." *Woods v. Pettine*, No. 13-cv-290 (PGG), 2014 U.S. Dist. LEXIS 9739, 2014 WL 292363, at *1 (S.D.N.Y. Jan. 27, 2014) (internal quotations omitted).

## III. Jurisdiction Under the Foreign Sovereign Immunities Act

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Yerkyn v. Yakovlevich*, 164 F.4th 224, 228 (2d Cir. 2026) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443, 109 S. Ct. 683, 102 L. Ed. 2d 818 (1989)); see also *Pablo Star Ltd. v. Welsh Government*, 378 F. Supp. 3d 300, 306 (S.D.N.Y. 2019).

A foreign state is defined in § 1603(a). Section 1603(a) of the FSIA provides presumptive immunity for a "foreign state," which includes "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603 (the "FSIA Definitional Provision"). The FSIA defines "agency or instrumentality" as an entity:

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless one of the limited exceptions enumerated in § 1605-1607 of the FSIA applies. 28 U.S.C. § 1604; see *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S. Ct. 1471, 123 L. Ed. 2d 47 (1993); *Pablo Sta*, 378 F. Supp.3d at 306. "When [a] defendant claims immunity under the FSIA and 'presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign.'" *Figueroa v. Ministry for Foreign Affairs of Sweden*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016) (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993)).

## DISCUSSION

Defendants argue that the Foreign Sovereign Immunities Act does not apply to RCA because they do not qualify as a foreign state under the statute. Defendants argue, in the alternative, that if they qualify as a foreign state, they are immune from suit and no exceptions to immunity apply. Plaintiffs argue that the Act does apply because foreign states, including their agencies and instrumentalities, are covered under the Act. Furthermore, Plaintiffs argue that RCA is not afforded sovereign immunity because at least one of two exceptions apply: (i) the commercial activity exception, or the (ii) expropriation exception.

When considering an exception to the FSIA, Plaintiff carries the burden "of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Schansman v. Sberbank of Russ. PJSC*, 2022 U.S. Dist. LEXIS 219959, *12 (S.D.N.Y. Dec. 6, 2022); *Freund v. Republic of France*, 592 F. Supp. 2d 540, 552-53 (S.D.N.Y. 2008)

(quoting *Cabiri v. Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999)). Once Plaintiff satisfies this burden of production, the burden of persuasion passes to Defendants to show that an exception to the FSIA does not apply. *Schansman*, 2022 U.S. Dist. LEXIS 219959, *12 (S.D.N.Y. Dec. 6, 2022); *Freund*, 592 F. Supp. 2d at 552-53 (providing that "the ultimate burden of persuasion remains with the alleged foreign sovereign"); *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183, 407 U.S. App. D.C. 133 (D.C. Cir. 2013).

## I. Defendants are Not Considered an Agency or Instrumentality of a Foreign State, or Political Subdivision Thereof.

First, it must be determined whether RCA is considered an agency, or instrumentality of a foreign state, or political subdivision thereof. Defendants do not dispute that RCA satisfies the first and third requirements—that they are a separate legal corporation and neither a citizen of the U.S. nor created under the laws of any third country. The second requirement of the agency or instrumentality test is at issue here. To satisfy this element, an entity must be either an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof. *Havlish v. Taliban*, 152 F.4th 339, 357 (2d Cir. 2025).

### a) RCA is Not an Organ of a Foreign State, or Political Subdivision Thereof.

The Second Circuit has no definitive rest to determine whether an entity is a government organ. *Qatar v. First Abu Dhabi Bank PJSC*, 432 F. Supp. 3d 401, 408; *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir. 2007). Instead, the *Filler* balancing test is used to determine whether an entity is a government organ. 378 F.3d 213 (2d Cir. 2004). The five factors to consider in determining whether an entity is a foreign

state's "organ" are: (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law. *Id.* at 217.

First, the "national purpose" factor asks whether the foreign state created the alleged organ for a national purpose, such as being formed by presidential decree or being entrusted with the central planning and management of a national industry. *Qatar*, 432 F. Supp. 3d 409. Stated in the Bogdanov Declaration, the purpose for creating the entity (complex for processing of ethane-containing gas realized through RCA) was for it to be the largest in the Russia Federation and one of the most powerful in the world complexes for processing of multi-component natural gas, which will significantly increase the production and export of valuable components of natural gas in the Russian Federation. ECF No. 30, Exhibit B at 2-3.

The project is aimed at achieving the objectives defined in Presidential Decree No. 474 of July 21, 2020 "On the National Development Goals of the Russian Federation for the period until 2030," the strategy of socio-economic development of the Leningrad Region until 2030, adopted by the Legislative Assembly of the Leningrad Region on July 13, 2016, and the state program of the Russian Federation "Energy Development" approved by the Government of the Russian Federation Resolution No. 321 "On Approval of the State Program of the Russian Federation "Energy Development" dated April 15, 2014. *Id.* at 3-4. These frameworks are set to achieve targets such as increasing the growth rate of the country's gross domestic and regional product,

fixed capital, and exports of non-resource non-energy goods. *Id.* These stated objectives seem to satisfy the first prong–the entity was created for a national purpose.

Second, the "supervision" factor looks to whether the foreign state regulates the entity or directs the entity's appointments or official acts. *Qatar*, 432 F. Supp. 3d at 410; *Peninsula*, 476 F.3d at 143 (2d Cir. 2007). A foreign state actively supervises an organ when it appoints the organ's key officials and regulates some of the activities the organ can undertake. *Qatar*, 432 F. Supp. 3d at 410; *European Cmty. v. RJR Nabisco, Inc., 764 F.3d 129, 145 (2d Cir. 2014).*

Plaintiffs do not provide sufficient evidence to satisfy this factor. In the Complaint, Plaintiffs focus on how Gazprom PJSC is totally controlled and dominated by Russia, thus in turn, RCA, as their subsidiary, is also controlled and dominated by Russia. Compl. at ¶134. Furthermore, in their Opposition, they argue RCA operates under significant state supervision because The Ministry of Energy of the Russian Federation is identified as "the federal executive body exercising control over the implementation of the investment project" in official state documentation. ECF No. 38 at 11. These allegations of indirect oversight do not rise to the level of supervision satisfied in other *Filler* analyses. *In re Terrorist Attacks*, 538 F.3d at 86 (the entity claiming organ status was "chaired or presided over by a government official and conduct[ed] its affairs in accordance with the domestic or foreign policy objectives of" Saudi Arabia); *Peninsula*, 476 F.3d at 143 (2d Cir. 2007) (finding entity was an organ in part because a foreign government appointed its governor and auditor, controlled its actions through an agency, and regulated its fees); *U.S. Fidelity & Guar. Co. v. Braspetro Oil Services Co.*, 1999 U.S. Dist. LEXIS 7236, 1999 WL 307666, *3 (S.D.N.Y. 1999) (concluding that defendant was an organ

because foreign country's president appointed its directors, approved its charter, and could inspect its financial reports).

Third, Plaintiffs do not allege that the Russian Federation requires RCA to hire public employees or pays their employees' salaries. Instead, they argue that RCA receives state financial support (for example, the Russian government committed to co-financing the project with up to 900 billion rubles in state funding). ECF No. 38 at 12. This evidence also fails to meet the third factor's requirements.

Fourth, the exclusive rights factor considers whether the entity possesses exclusive rights to some right in their home country. Courts examining the "exclusive rights" factor have given it broad meaning. *In re Terrorist Attacks*, 538 F.3d at 86 (entity held an exclusive right because it was the sole authority to collect and distribute certain charity funds); *Peninsula*, 476 F.3d at 143 (2d Cir. 2007) (the entity held an exclusive right because it was had the sole authority to receive monthly business reports from the solvent financial institutions it oversaw); *Kelly v. Syria Shell Petroleum Development B. V.*, 213 F.3d 841, 848 (5th Cir. 2000) (the entity had the exclusive right to explore and develop Syria's identified petroleum reserves). Plaintiff claims the Russian Federation conferred them the exclusive right to develop and operate the Ust-Luga gas processing complex. ECF No. 38 at 11. Given Courts broad meaning of "exclusive rights," this can be considered satisfactory for the purpose of the fourth factor.

Last, the Court turns to how foreign law treats RCA. This factor is satisfied when, for example, the foreign state informed the U.S. State Department and the district court that it treats the entity as a government entity. Peninsula, 476 F.3d at 143 (2d Cir. 2007). Another example is if the entity receives a special privilege under foreign law, such as immunity from taxation. *See California Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1102 (9th Cir. 2008). Plaintiffs

assert Russian law affords RCA special status due to its strategic importance in Russia's energy sector. ECF No. 38 at 12. Furthermore, its projects are included in federal programs overseen by the Ministry of Energy and other state agencies and coordinated with federal authorities. *Id.* These assertions do not demonstrate that foreign law treats RCA as a government entity, nor that it affords it any special legal privilege. Thus, this factor fails as well.

With satisfying only two of the five *Filler* factors, the balancing test weighs against conferring RCA organ status. While this Court is not constrained to the *Filler* factors and they are not considered necessary conditions for an entity to be an organ, there is still a lack of evidence that RCA is considered an organ of the Russian Federation. *Qatar*, 432 F. Supp. 3d at 412; *Scheidemann*, 2008 U.S. Dist. LEXIS 2852, 2008 WL 144846, *3 (S.D.N.Y. 2008).

**b) A Majority of Shares of RCA is Not Owned by a Foreign State, of Political Subdivision Thereof.**

Defendants argue that RCA fails the ownership test because there is no direct ownership interest of the Russian state. They argue that there is indirect participation of the Russian state through the presence of Gazprom PJSC—the parent company of RCA. ECF No. 33 at 10. Plaintiffs argue that RCA's ownership structure is opaque, and it is unclear who owns a majority of their company's shares. ECF No. 38 at 8. Either way, the ruling in *Farah v. Emirates* instructs this analysis. In that case, the Court could not find Emirates to be an instrumentality of Dubai on the basis of the government's ownership of an intermediary company, ICD because Emirates is not itself owned by "a foreign state or a political subdivision thereof," but is instead owned by an intermediary corporation which is, in turn, controlled by the Government of Dubai. *Farah v. Emirates*, 728 F. Supp. 3d 290, 307. The FSIA only provides immunity for instrumentalities

which are directly owned by a foreign state; the "tiering" of instrumentalities and subsidiaries is not permissible under the FSIA. *Id.*; *Filler v. Hanvit Bank*, 378 F.3d 213, 219 (2d Cir. 2004).

**The Commercial Activity Exception Would Apply**

While the Court finds that RCA does not qualify as a foreign state under the FSIA, the application of the exceptions shall be analyzed in this section for the sake of completeness. The commercial activity exception to sovereign immunity allows for jurisdiction where a sovereign essentially acts as a private party by engaging in commercial activity. *See* 28 U.S.C. § 1605(a)(2). Section 1605(a)(2) of the FSIA, the statute's commercial activity exception, provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case" in which the action is *based upon* (1) "a commercial activity carried on in the United States by the foreign state"; (2) "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." To fall within the commercial activity exception, the Defendants' activities need to qualify for at least one of the categories specified in §1605(a)(2). *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 348 (2d Cir. 2021).

The "commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d); *NML Cap., Ltd. v. Republic of Arg.*, 680 F.3d 254, 257 (2d Cir. 2012). To determine the nature of a sovereign's act, Courts inquire whether the particular actions that the foreign state performs are the *type* of actions by which a private party engages in trade and traffic or commerce." *Koudou v. Permanent Mission of Côte d'Ivoire to the UN in N.Y.*, 2026 U.S. Dist.

LEXIS 73977, *5 (S.D.N.Y. Apr 3, 2026). Furthermore, a foreign state engages in commercial activity for purposes of the FSIA only where it acts not as a regulator of the market, but in the manner of a private player within the market. *Id.*; *Schansman v. Sberbank of Russ. PJSC*, 128 F.4th 70, 81. "Whether conduct is commercial turns on the 'nature' of the sovereign's relationship with the plaintiff and the acts giving rise to the claim." *Koudou*, 2026 U.S. Dist. LEXIS 73977, *6; *Gnopo v. Permanent Mission of Cote D'Ivoire to the UN in N.Y.*, 2026 U.S. Dist. LEXIS 35377, 2026 WL 483158, at *3.

The seizure of the helium containers can be considered a commercial activity for the purposes of Section 1605(a)(2) of FSIA. It is alleged that RCA maintains possession of the property in response to the failure of Linde GmbH and Linde plc to complete the Construction Contracts/repay the advance, and the Russian Court's *ex parte* order freezing and seizing their assets. While RCA's purpose for seizing the helium containers is irrelevant to this analysis, their act can still be considered a power that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Pablo Star*, 961 F.3d at 561. A private company, upon Court order, can use these mechanisms to induce recovery in a contractual dispute. Furthermore, Plaintiffs have demonstrated sufficiently how the seizure of the helium tanks has had direct effects on Linde's business within the United States. ECF No. 38 at 17-20.

## II. The Expropriation Exception Would Not Apply

The expropriation exception requires that stolen property, or property exchanged for such property, have a commercial nexus to the United States. *Republic of Hungary v. Simon*, 604 U.S. 115, 122. Specifically, §1605(a)(3) allows individuals to sue foreign sovereigns in United States courts when: (i) rights in property are at issue (ii) that the property was "taken" (iii) that the taking was in violation of international law, and...(iv)(a) "such property is present in the United

States in connection with a commercial activity carried on in the United States by the foreign state," or (iv)(b) "that property… is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." As Linde Inc. is incorporated in the United States and RCA, established under Russian law, deprived the alien of their property, the taking is in violation of international law. *F.R.G. v. Philipp*, 592 U.S. 169, 180.

However, Plaintiffs have not established that the instrumentality is engaged in commercial activity in the United States. In the Complaint, Plaintiffs argue that "RCA is rightfully treated as an agent of the government of Russia with respect to the conduct at issue here and must be deemed to have the same contacts with the United States as does Gazprom PJSC" without providing any evidence that RCA directly engaged in business with the United States. Since the property is not present in the United States, the other nexus requirement also fails. So, the expropriation exception would not apply.

## CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss is **GRANTED** without prejudice. Before setting a date for Plaintiff to amend their Complaint, I request that the parties file briefs on whether granting jurisdictional discovery is necessary. Plaintiffs have until November 6, 2026, to submit a brief. Defendants have until November 13, 2026, to oppose. Plaintiffs then have until November 20, 2026, to reply.

**SO ORDERED.**

**Dated: September 30, 2026**
**New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**